SONAT EXPLORATION COMPANY, substituted for Eason Oil Company, Appellant (Plaintiff),

v.

SUPERIOR OIL COMPANY, True Oil Company, Frank W. Winegar, and Petroleum, Inc., Appellees (Defendants).

No. 84–293.

Supreme Court of Wyoming.

Dec. 4, 1985.

Thomas E. Lubnau and Thomas E. Lubnau, II, Gillette, and Richard B. Bates, Okl., for appellant (plaintiff).

Houston G. Williams, of Williams, Porter, Day and Neville, P.C., Casper, for appellees (defendants).

Before THOMAS, C.J., and ROSE,[*] ROONEY,[**] BROWN and CARDINE, JJ.

ROSE, Justice.

This appeal originates from a complaint filed by Eason Oil Company (Eason) seeking cancellation of an oil and gas lease by reason of the lessees' alleged breach of the implied covenant to develop. The trial court refused to grant the cancellation and Eason has appealed to this court.[1] One of the issues presented by this appeal is whether a lessor—or one standing in the shoes of a lessor [2]—must prove a reasonable expectation of profit from further drilling in order to establish a breach of the implied covenant to develop. A second issue is whether the evidence supports the conclusion that Eason failed to prove a breach of the implied covenant. We hold that, even after a substantial delay between the last drilling and the commencement of the action to cancel the lease, a lessor—in order to establish the breach in question—must carry the burden of proving lack of reasonable diligence on the part of the lessee, which burden includes the showing of a reasonable expectation of profit for both the lessor and lessee from further drilling. In this case, the trial

[*] Retired November 1, 1985.

[**] Retired November 30, 1985.

1. Sonat Exploration Company was substituted for Eason Oil Company after the briefs in this case had been submitted.

2. Eason's predecessor in interest was in fact the lessor in the case in controversy here where Superior Oil Company is the lessee.

court did not err in concluding that the lessor failed to establish that the lessees breached the implied covenant of development.

We will affirm.

## BACKGROUND

In January, 1978, appellant Eason purchased 6,006.85 net mineral acres in Crook and Campbell Counties, Wyoming, from Colorado National Bank of Denver, Colorado. At the time of the purchase, some of these lands were subject to an oil and gas lease, dated December 8, 1957, which lease was entered into with Eason's predecessor in interest as lessor and appellee Superior Oil Company (Superior) as lessee. Although this lease was of record, Eason mistakenly believed that the lands which were subject to the lease had been released when, in fact, only a portion of the lands had been released.

Superior's lease from the bank included six separate tracts of land located from two to nine miles away from each other in the Powder River Basin, and its term was for a period of ten years and as long thereafter as oil or gas was being produced. Although there were originally six tracts [3] under lease, Eason, in this action, does not ask that all of this land be released. In May of 1960, production was obtained by Superior on tract 6 and was unitized as part of the Rozet Muddy Sand Unit, and the land covered by the unitization agreement was not subject to cancellation for failure to develop. Appellees True Oil Company and Frank W. Winegar obtained their interest in the Superior lease by way of assignment following True's drilling of a dry hole prior to the execution of the Superior lease.

In 1964, pursuant to a farmout agreement, Continental Oil Company drilled a dry hole on tract 5. No other wells have been drilled on the property covered by the subject lease and the appellant contends that for the last 20 years appellees have not further explored or developed the lease as they were obligated to do.

In July of 1977, demand was made upon appellee Superior Oil Company that the lands outside the unit be further developed or released. Thereafter, appellant received a letter from Superior which said it was being recommended that all of said lands be released, but it turns out that Superior released only the 320-acre tract upon which Conoco had drilled a dry hole. Appellant erroneously believed, however, that all lands had been released. Later, when Eason came to realize that the bulk of the properties remained encumbered by Superior's lease, Eason brought suit seeking to require appellees to either drill additional wells or have the lease upon the undeveloped portions of the leasehold cancelled on grounds that the lessees had breached the implied covenant to develop.

In defense of the failure-of-development charges, appellees/lessees point to additional activities which they contend were sufficient to hold the lease. First, they note that Superior had entered into a farmout agreement on tract 1 in April of 1984, a little over a month before this action was filed. Additionally, Superior was a party to a farmout on tract 3 under date of July 10, 1984, and has negotiated for another farmout on tract 2. In addition to this flurry of activity near the commencement of the suit, Superior had also entered into various farmout options offsetting tract 2, and the record reflects that it supported another company's offset to Superior's well with dry-hole contributions. Lessees have presented other evidence, which we will discuss later in this opinion, to support their claim that there has not been a breach of the implied covenant to develop.

Lessees have called to the court's attention the fact that Eason purchased the minerals under these lands in 1978, believing that they were not subject to any lease. Although Eason did exploratory work on

---

**3.** In this opinion we refer to the tracts by number, as they were referred to throughout this litigation.

other tracts which were acquired at the same time, it did not drill on the lands in controversy here during the six years it believed it owned the minerals in question free from other ownership burdens, except that Eason did give a farmout option off-setting tract 1, which turned out to be a dry hole.

Following a bench trial, the court found generally in favor of the lessees and against Eason on all issues. The court held that before the lease could be cancelled for failure to develop the plaintiff had the burden of proving that the development, which was undertaken, was inadequate, and, as a part of this burden, it was the plaintiff's additional obligation to prove that further development would result in a reasonable expectation of profit for both the lessees and the lessor. The court found that Eason did not carry this burden, and refused to cancel the lease.

Eason claims that there are three issues for our review:

"A. WHETHER THE COURT BELOW ERRED IN FAILING TO DETERMINE WHETHER APPELLEES HAD BREACHED AN IMPLIED COVE-NANT TO REASONABLY DEVELOP THE OIL AND GAS LEASE.

"B. WHETHER THE COURT BELOW CLEARLY ERRED IN HOLDING THAT APPELLANT MUST PROVE THAT FURTHER DRILLING WOULD BE REASONABLY PROFITABLE.

"C. ASSUMING, ARGUÉNDO, THE COURT BELOW WAS CORRECT IN ITS FINDINGS, IT CLEARLY ERRED IN NOT SETTING FORTH A TIMETA-BLE FOR FUTURE DEVELOPMENT."

It is our judgment that the trial court decided the question which asks whether appellees had breached an implied covenant to reasonably develop, and, therefore, ap-pellant's first issue will not be considered. Instead, we consider whether the record contains sufficient evidence to support the trial court's finding that the implied cove-nant to develop was not breached. This issue leads us to the second question which asks whether further drilling would carry with it a reasonable expectation of profita-bility and whether the court erred in hold-ing that it was appellant's burden to make the proof on the profitability issue. Final-ly, we will contemplate appellant's conten-tion that the trial court was required to implement a timetable for future develop-ment.

It is clear from Eason's statement of the issues that it believes the trial court failed to determine whether the lessees breached the implied covenant to reasonably develop. Eason relies upon the court's reference to the following sentence in paragraph 16 of the lease:

"* * * The conduct of drilling or produc-ing operations at any place within any pooled area shall constitute at all times full compliance with and performance of all development, drilling and producing obligations, expressed or implied, under this lease, insofar as they occur upon or affect respective tracts comprising part or parts of the pooled area, and shall also constitute development, drilling or pro-ducing operations affecting all lands un-der this lease, and no obligations either expressed or implied shall be imposed upon Lessee as to any lands in any such pooled area or as to lands adjoining such pooled area where the well site is or has been fixed elsewhere by such state or federal spacing regulations, notwith-standing that at any time or from time to time said regulations or any of them may be amended, revoked or cancelled. * * "

Paragraph 16 was referred to by counsel for appellees in his opening statement where he urged that this sentence supports the position which holds that drilling at any place within a pooled area would constitute full compliance with all expressed or im-plied obligations. Appellant argues that a careful reading of the sentence shows that "the parties expressly agreed that implied obligations were to be applied to all non-contiguous lands under the lease" and that the trial court erred in not addressing itself to whether there was an implied covenant to develop.

It is not necessary that we contemplate the issue which asks whether the language of the lease negated the usual implied obligations. Although the trial court may have referred to this argument in its decision, it also considered the implied-covenant-to-develop issue and specifically observed that the appellant had the burden of proving development was reasonable under the facts of record; that there was a reasonable expectation of profit; and that the appellant failed to discharge its burden of proof. This statement was made after the court had heard the evidence of both parties pertaining to the issue having to do with the question of reasonable development of the lands in issue here. The alleged breach of the implied covenant was pleaded and argued by counsel, evidence was introduced, and the question was decided by the trial court.

Although appellant directs much of its attack to the statements of the trial court pertaining to paragraph 16, we hold that whether those statements are or are not subject to challenge is not decisive here. We said in *Chesney v. Valley Live Stock Co.*, 34 Wyo. 378, 244 P. 216, 221, 44 A.L.R. 1255 (1926):

" * * * [The court] arrived at the correct conclusion, and we cannot reverse the case, because such conclusion is founded partially or wholly upon the wrong premises."

Accord *Robinson Transportation Company v. Hawkeye-Security Insurance Company*, Wyo., 385 P.2d 203 (1963).

It is well established that where the decision of the trial court is correct on any theory it will not be disturbed. *ABC Builders, Inc. v. Phillips*, Wyo., 632 P.2d 925 (1981); *Miller v. Hedderman*, Wyo., 464 P.2d 544 (1970); *Gardner v. Walker*, Wyo., 373 P.2d 598 (1962). The trial court considered the question of breach of the covenant to develop and decided that the appellant failed to present sufficient evidence establishing a breach. We will review this decision.

## IMPLIED COVENANT TO DEVELOP

■ It is well established that oil and gas leases such as that with which we are concerned contain an implied covenant of development. We recognized this in *Phillips v. Hamilton*, 17 Wyo. 41, 95 P. 846 (1908), where we followed the rule developed in *Brewster v. Lanyon Zinc Co.*, 140 Fed. 801 (8th Cir.1905), to the effect that the lessee must act with reasonable diligence in developing the minerals under the lease.

■ The court in *Brewster* established the following guidelines for determining whether a lessee had failed to act with the diligence required under the implied covenant:

" * * * No obligation rests on [the lessee] to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. * * * Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefor * * *, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir * * *. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. * * * " 140 Fed. at 814.

The court said that the lessee's diligence must be measured by the "prudent operator" test.

The court, in *Brewster*, having established these guidelines, went on to note that breaches of implied covenants to develop are questions of fact which must be resolved in each case according to its particular circumstances. 140 Fed. at 813. In *LeBar v. Haynie*, Wyo., 552 P.2d 1107 (1976), we agreed that reasonable diligence on the part of the lessee is a factual issue when we said:

" * * * *Phillips v. Hamilton,* 17 Wyo. 41, 95 P. 846, 849 * * * leaves the clear inference that diligence is a question of fact and intention which must be developed and decided in each case. * * * " 552 P.2d at 1111.

We found the following statement applicable to and demonstrative of the proposition that the diligence of a prudent operator to develop as contemplated by the implied covenant of an oil and gas lease is a factual question:

" 'In cases questioning the development done by an operator under the prudent operator rule, the actions of the operator are examined item by item. * * * These items constitute fact questions and on appeal the findings made in such a suit must be treated accordingly. * * * ' *Chenoweth v. Pan American Petroleum Corporation,* 10 Cir., 314 F.2d 63, 65–66." 552 P.2d at 1111.

*Chenoweth v. Pan American Petroleum Corporation,* 314 F.2d 63 (10th Cir.1963), also held that a lessee is not required to further develop the lease in a proven field unless there is a reasonable expectation of profit.

Having held that diligence is a question of fact which must be decided in each case, the applicable appellate fact-question rule is:

" * * * We will not substitute our judgment for that of the trier of fact, findings of fact will be presumed to be correct and we will set them aside on appeal only where such findings are 'clearly erroneous or contrary to the great weight of evidence,' *Kvenild v. Taylor,* Wyo., 594 P.2d 972, 976 (1979) * * *." *Yost v. Harpel Oil Company,* Wyo., 674 P.2d 712, 716 (1983).

With these well-established rules in mind, we proceed to examine the evidence in this case. Appellees obtained their lease of the six tracts in 1957 for a primary term of ten years and as long thereafter as oil or gas is produced. Appellee Superior drilled a productive well, in 1960, on tract 6. Also,

Superior paid one-half of the cost of drilling two offset wells drilled by Davis Oil Company in 1960–1961 near tract 6. Superior expended a total of approximately $180,000 on these producing wells and the lessor has participated in the production from these efforts ever since. Superior and appellant's predecessor in interest joined in the Rozet Muddy Sand Unit in 1967, committing all acreage and production in tract 6 to the unit agreement, and Superior has contributed approximately $212,000 toward the drilling of other wells in this unit.

The record contains evidence of other efforts to develop employed by Superior. In 1970, Superior contributed dry-hole money in the amount of $4,386.50 to support a well in the Rozet Muddy Sand Unit. In 1974, this same appellee entered into a farmout agreement for an offset to tract 2. In 1976, Superior granted yet another farmout option to the same tract. In 1983, Superior entered into a farmout option agreement to lands in tract 2. In this farmout, the company receiving it drilled a dry hole offsetting the land contemplated by the farmout agreement and then decided not to exercise its option to drill on the lands within the lease.

In 1964, Superior assigned a part of the lease in question to Continental Oil Company. After Continental drilled a dry hole on tract 5, it reassigned the lease back to Superior. Three hundred twenty acres of tract 5 were released to appellant's predecessor in 1978, after it had demanded release of all of the acreage outside the Rozet Muddy Sand Unit.

Shortly before this action was commenced, Superior committed to a farmout on tract 1. In addition, there had been negotiations concerning farmouts on tracts 2 and 3. This recent activity, along with the above-mentioned drilling activity, contributions, and farmouts, constituted the extent of Superior's actions.

In addition to their own activities, appellees presented evidence of a number of

Minnelusa[4] dry holes drilled by others off-setting most of the tracts in the lease. There was also a dry hole drilled in tract 4 by appellee True prior to the execution of the Superior lease. Finally, appellees pointed out that although Eason believed that these tracts had all been released in 1978, it had failed to drill upon any of the tracts during the six years of ownership and had entered into only one farmout agreement during this time.

While observing that it had been a long time since any actual development efforts had been undertaken, the trial court noted that it was the appellant's burden to prove that further development is reasonable and that the appellant had failed to carry its burden of proving this proposition. The court therefore held that the lease would not be cancelled.[5]

When we review the development history of the lessees' efforts, we cannot say that the trial court erred in holding that appellant failed to establish the breach of the covenant to develop.

■ While we are aware that there have been 20 years since the last drilling on these tracts, we hasten to observe that the required development consists of more than just drilling. Other courts have said that dry-hole contributions and farmouts are also exploratory acts. *Felmont Oil Corporation v. Pan American Petroleum Corporation,* Tex.Civ.App., 334 S.W.2d 449 (1960). In 1974, 1976 and 1983 Superior entered into farmout-option agreements offsetting various tracts of the lands in question. Shortly before Eason initiated this suit, Superior had negotiated for a number of other farmouts. In addition, a Superior production geologist testified that he had been studying the Minnelusa of the Powder River Basin since January, 1982, but that he could not recommend that his company drill on these tracts. These activities indicate that, although Superior may feel it is not now prudent to drill upon

these properties, this is not to say that it is engaged in the business of preventing or hindering the development of the properties in question. In fact, just the opposite conclusion must be drawn from a careful analysis of Superior's efforts.

■ It is to be further noted that, when considering the issue of reasonable diligence, the activities of appellees are not the only factors which must be taken into account. "In determining what is required by ordinary prudence, developments made by other operators in the territory and the results obtained by them may and should be considered." 58 C.J.S. Mines and Minerals, § 202 at 476 (1948). *Brewster v. Lanyon Zinc Co.,* supra, supports this proposition, where the court said that determining whether reasonable diligence is exercised depends in part upon "the extent and results of the operations, if any, on adjacent lands." 140 Fed. at 814. In the case at bar, the record discloses that tract 1 was bracketed by two Minnelusa dry holes. There were also two Minnelusa dry holes adjacent to portions of tract 2. On tract 3 there were no offsetting wells drilled but a number of dry holes had been drilled "all around." Finally, on tract 4 appellee True had drilled a dry hole to a shallower formation and there were other dry holes close to this tract which had been drilled to the Minnelusa. So, although the Powder River Basin, of which these tracts are a part, contains many productive wells, it appears that the drilling in the near proximity to the leased lands consistently resulted in dry holes. These efforts and results experienced by others who have attempted to develop on adjacent or geologically relevant properties are part of the circumstances which are important to the resolution of the reasonable-diligence issues.

Additionally, we hold it to be informative to look at the inaction on the part of Eason. Eason believed for six years that it owned the mineral interests to these tracts, free

**4.** Eason's geological expert dealt primarily with the Minnelusa formation, which is below other producing formations in the area.

**5.** While the record is confusing concerning the exact words utilized by the judge, we are of the opinion that this is what his holding is.

from any encumbrance. Despite this, the appellant did not drill upon any of the tracts and only entered into one farmout agreement. For us, this course of inactive conduct tends to have the effect of diluting Eason's contention that an operator of reasonable diligence would have conducted a more energetic development program than that undertaken by Superior.

■ The facts and factors discussed and disclosed above must properly be taken into account when considering whether a lessee has acted with reasonble diligence in the discharge of its leasehold-development obligations. The only indication of lack of diligence which we find to be present is the lapse of time from appellees' last drilling to the commencement of the suit. Other courts have properly stated that although the time factor is an important consideration in determining reasonable diligence, it is not all controlling. *Sun Oil Company v. Frantz*, 291 F.2d 52, 54 (10th Cir.1961). Along with the delay and other considerations discussed above, it is also imperative, when contemplating a reasonable-diligence issue, to consider whether further drilling would prove profitable, not only to the lessor but also to the lessee.

### PROFITABILITY

Eason contends that the trial court erred by placing upon it the burden of proving that additional drilling would be profitable. We hold that the trial court correctly assigned this burden of proof and error was not committed in this respect.

> "In actions based upon alleged breach of implied covenants it is the uniform rule that the burden of proof is upon the lessor to establish such breach by a preponderance of the evidence." 2 Brown, The Law of Oil and Gas Leases, § 16.03, at 16–114 and 16–114.1 (2nd ed. 1985).[6]

In Oklahoma this rule has been modified. Oklahoma places the original burden upon the lessor to establish breach of the implied covenant of development. *Union Oil*

*Company of California v. Jackson*, Okl., 489 P.2d 1073 (1971). However, in Oklahoma, where there is an unreasonable time lapse between the last well drilled and action to have the lease cancelled, the burden shifts and the lessor is relieved of the burden of proving that the other wells would be profitable. *Lyons v. Robson*, Okl., 330 P.2d 593, 596 (1958). Exactly what constitutes an unreasonable length of time in these cases has not been, and probably cannot be, defined with any satisfactory precision.

While some courts have adopted the Oklahoma position of shifting burdens, see, e.g., *Nolan v. Thomas*, 228 Ark. 572, 309 S.W.2d 727 (1958), others continue to place the burden upon the lessor to prove that additional drilling would carry with it a reasonable expectation of profitability. When the lessors sought cancellation in *Felmont Oil Corporation v. Pan American Petroleum Corporation*, supra, 334 S.W.2d at 455, the court held:

> " * * * [T]he burden rests upon appellants [lessors] to do more than merely prove that a ready, able and willing operator would drill, regardless of the certainty of profit. * * * "

The lessor must also show

> " * * * [t]hat by the drilling of additional wells, there would be a reasonable expectation of profit, not only to the lessor, but also the lessee. [Citations.]" *Id.* at 455.

See also *Superior Oil Company v. Devon Corporation*, 604 F.2d 1063 (8th Cir.1979).

While we concede that the rule of placing the burden upon the lessor to prove profitability might not be uniformly followed, it is, nonetheless, well settled that "[i]n general, in order to require a lessee to drill and develop under an implied covenant, there must be a reasonable expectation that oil or gas will be produced in paying quantities," 58 C.J.S. Mines and Minerals, § 202 at 475 (1948), and that "the burden has

---

6. Even though Eason is not Superior's lessor, it stands in the shoes of the lessor in a lease-cancellation suit since its purchase from its predecessor in interest must have been subject to any valid and existing oil and gas leases.

been held on the lessor to prove a breach by the lessee of his obligations under the lease." *Id.,* § 204 at 497.

Even though the general rule is that a lessor must show that there is a reasonable expectation of profit in order to prove that the lessee has breached the implied covenant to further develop, appellant treats the Oklahoma holdings as though they were representative of the general rule and argues that the trial court was required to follow this approach. From this predicate, Eason urges that the trial court therefore erred in charging it with the burden of proving reasonable expectation of profit. Regardless of whether the rule in Oklahoma is contrary to the uniform rule, we do not understand it to be the rule in Wyoming, and we do not believe that the Oklahoma rule should be adopted.

As noted above, this court followed *Brewster v. Lanyon Zinc Co.,* supra, in holding that there is an implied covenant to develop. In *Brewster,* it was said that "no breach can occur save where the absence of such diligence is both certain and substantial." 140 Fed. at 814. We noted in *Phillips v. Hamilton,* supra, 95 P. at 849, that, "the evidence in this case is insufficient to show * * * a failure to exercise reasonable diligence in the work of prospecting and drilling for oil and gas on the leased premises." These statements stand for the proposition that the *Brewster* court and this court have placed the burden of establishing a lack of diligence upon the lessor.

■ Appellant argues in its brief that the burden-shifting concept, for which it contends, is the "modified *Brewster* rule" and would have this court follow Oklahoma's modification of *Brewster* by shifting the burden to the lessee to establish his diligence where there had been an "unreasonable" length of time between the last well drilled and the suit seeking cancellation of the lease. From this, appellant would have us hold that an unreasonable length of time has elapsed under the facts of this case as a matter of law. The case upon which Eason primarily relies estab-

lishes three burden-of-proof standards having to do with the time of delay. *Blake v. Texas Co.,* 123 F.Supp. 73 (E.D.Okl.1954). In Blake, the court concluded that proof of a number of years' delay would irrebuttably establish lack of diligence, while proof of such delay may under other circumstances only shift the burden to the lessee to establish his diligence, and still other delays would not be sufficient to shift the burden from lessor to lessee. Attempting to decide which factual circumstances operate to shift the burden under differing periods of delay would seem to be a difficult if not impossible task, and one which we do not believe should be undertaken. Instead, we will continue to follow the rule that the lessor must prove that the lessee has breached the implied covenant of development under the prudent-operator test.

In reaching our conclusion on this point, we do not hold that the time factor is unimportant. The length of time between the lessee's last development effort and the suit seeking cancellation is of critical importance in determining whether the lessee has acted with the required diligence. We do not believe, however, that it would be wise to modify the rule in *Brewster,* and declare that, following an allegedly unreasonable delay, the burden upon the issue of profitability should be shifted to the lessee. It is our judgment that the process of ascertaining the circumstances and lengths of delays which would shift the burden would unduly impede the determination of the ultimate question, i.e., whether the lessee has acted as a prudent operator. Therefore, we hold that, while the length of delay is an important element in determining due diligence, it is not, however, necessarily the controlling factor. *Sun Oil Company v. Frantz,* supra.

■ Having decided that the trial court correctly placed the burden upon the lessor to establish that there was a lack of diligence (which encompasses the burden of proving reasonable expectation of profit from additional drilling), we have no difficulty in sustaining the finding that Eason failed to carry its burden. When asked on

direct examination whether there was a probability of obtaining oil from the tracts of land in question, Eason's expert (Darnall) stated:

"* * * [T]he possibility is there, but I'd want to do the other work before I drilled or recommended drilling."

Mr. Darnall did testify that the average Minnelusa well produced 600,000 barrels of oil valued at $14,700,000. He also testified that the success ratio in the area was 28%, and that the costs of drilling were approximately $250,000 for a dry hole and $500,000 for a producing well.

On the other hand, Darnall admitted that the success ratio of 28% was for the entire Powder River Basin area, and that this percentage did not pertain to the tracts in question or the ranch in the immediate vicinity of those tracts. In fact, he explained that any wells which would be drilled to the Minnelusa on the tracts which are in issue here would be wildcat prospects and that the success ratio is one in ten to fifteen for wildcat wells. It was also established that a number of dry holes had been drilled near these tracts (with one dry hole on tract 5), and Darnall said that "any dry hole * * * cuts down the size of a potential producing area in the vicinity unless the well was plugged by mistake."

Perhaps most informative was this witness' conclusion that, without further testing, he could not recommend that his company drill on any of the tracts in question at the present time. Eason's own inaction with respect to the development of these tracts is consistent with its own expert's judgment. Although Eason believed for six years that it owned these minerals free from any lease, it did not attempt to drill upon any of the tracts.

■ This was the only evidence appellant produced in attempting to show that there was a reasonable expectation of profit if more wells were drilled. It must be assumed that the trial court did not believe that this testimony was sufficient to support a holding that appellant had discharged its burden, and we cannot say that the trial court erred in this finding. We

therefore affirm the trial court's conclusion that appellant failed to establish a reasonable expectation of profit from further drilling, and reiterate that the other factual disclosures support the conclusion that appellees did not fail to exercise reasonable diligence in pursuit of their obligation to develop the lease.

We note that Eason relies upon *Byrd v. Bradham*, 280 Ark. 11, 655 S.W.2d 366 (1983), for the proposition that the lessee, who claims he is not under an obligation to drill when it would not be profitable, loses nothing by cancellation of the lease. The facts of *Byrd* make that case distinguishable because there the lessee had taken no action regarding the leasehold for 28 years. Additionally, the lessee in *Byrd* could not rely on other activity which showed that drilling would be an unprofitable venture. In any event, we believe that a lessee who is acting prudently by not developing under present circumstances indeed would lose a great deal if the lease were to be cancelled and shortly thereafter market conditions change or technological advancements are made so that further development becomes prudent.

Eason also urges that the decision in *Sauder v. Mid-Continent Petroleum Corp.*, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255 (1934), is controlling. In *Sauder*, the trial court "found that there was some probability that damage was being done to the leasehold through drainage by wells on adjoining property." *Id.* at 277, 54 S.Ct. at 672. There were no farmouts given to explore the lease and there was "no present intention of drilling at any time in the near or remote future." *Id.* at 281, 54 S.Ct. at 674. We believe that Sauder is distinguishable from the case at bar and again note that what constitutes a breach of the implied covenant to develop is "a question which is so largely one of fact that it must be resolved in each case according to its particular circumstances." *Brewster v. Lanyon Zinc Co.*, supra, 140 Fed. at 813.

### TIMETABLE

Lastly, appellant contends that the trial court erred in failing to set a timetable for future development. Appellant bases its contention on the premise that the implied covenant of development was breached. This, of course, is not what the trial court found. Although we might agree that a court could establish a timetable for development if the implied covenant of development is breached, see, e.g., *Rush v. King Oil Company*, 220 Kan. 616, 556 P.2d 431 (1976); 5 Williams and Meyers, Oil and Gas Law, § 834 at 247 (1984), we find no authority for the proposition that it must set a timetable when no breach of the implied covenant was found.

Affirmed.